**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

JUANIBEE JENNIFER JACKSON,

                 Plaintiff,

v.                                        ACTION NO. 2:13cv357

CAROLYN W. COLVIN,
Acting Commissioner
of Social Security,

                 Defendant.

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff brought this action under 42 U.S.C. §§ 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be VACATED and REMANDED to the Commissioner for further analysis consistent with this Report and Recommendation.

**I. PROCEDURAL BACKGROUND**

Plaintiff protectively applied for DIB and SSI on July 29, 2010, alleging disability since

January 10, 2007,[1] caused by panic attacks, anxiety, bipolar, and arthritis. R. 185-98, 224.[2]

Plaintiff's applications were denied initially, R. 128-33, and on reconsideration, R. 138-51.

Plaintiff requested a hearing by an Administrative Law Judge (ALJ), R. 152-53, which occurred

on March 14, 2013. R. 45-70.  Plaintiff, represented by counsel, and a vocational expert testified

before the ALJ. R. 45-70.

On April 3, 2012, the ALJ found that Plaintiff was not disabled within the meaning of the

Social Security Act. R. 27-40.  The Appeals Council denied Plaintiff's request for administrative

review of the ALJ's decision. R. 1-4. Therefore, the ALJ's decision stands as the final decision

of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20

C.F.R. §§ 404.981, 416.1481 (2012).

## II. FACTUAL BACKGROUND

### A.  Plaintiff's Background

Born in 1965, Plaintiff was forty-two years old on her alleged disability onset date and

forty-six years old at the time of her administrative hearing. R. 49.  She has past relevant work as

a cashier and a nursing assistant. R. 213.  She last worked in 2010 at the Navy Exchange. R. 51.

Her date last insured is June 20, 2014.  R. 32.

### B.  Plaintiff's Medical History[3]

#### 1. Hospital and Emergency Room Visits

On September 29, 2009, Plaintiff was admitted to Sentara Bayside Hospital, complaining

of chest pain and shortness of breath.  R. 267-68.  She was hyperventilating and had tingling

feelings in her lips and fingers.  R. 268.  She admitted to feeling stressed, and the doctors noted a

---

[1] Plaintiff's previous application for disability was denied on January 9, 2007.  R. 79-89.
[2] The citations in this Report and Recommendation are to the Administrative Record.
[3] Because of the nature of the issues raised by Plaintiff, this Report and Recommendation focuses its factual discussions on Plaintiff's mental health records.

history of depression and anxiety.  R. 268-69.  She was diagnosed with dyspnea and anxiety, and was discharged from the hospital.  R. 272-73.

On January 25, 2010, Plaintiff went to the emergency room at Sentara Norfolk General Hospital with atypical chest pains.  R. 314.  Doctors at the emergency room diagnosed Plaintiff's chest pain as being most likely caused by musculo-skeletal issues, but that anxiety and stress were also likely to cause the pain. R. 318.[4]

### 2. Atlantic Psychiatric Services

On May 6, 2009, Plaintiff had an initial diagnostic evaluation at Atlantic Psychiatric Services, P.C., with Rebecca E. Barchas, M.D., F.A.P.A.  R. 292-97.  In the evaluation, Dr. Barchas noted that Plaintiff's chief complaints were stress, panic attacks, and depression, and indicated that Plaintiff got very depressed and had severe mood swings and anger.  R. 292.  Dr. Barchas opined that Plaintiff's first panic attack was in 1996, on a flight to Italy.  R. 292. Plaintiff had a nervous breakdown in 2005, and could not go outside for a year because she was afraid the people outside were trying to kill her.  R. 292.  Dr. Barchas also noted that Plaintiff had delusions and hallucinations.  R. 292.  Plaintiff's mother was schizophrenic, and both parents used drugs.  R. 293.  Plaintiff smoked a third of a pack of cigarettes a day, and occasionally drank a bottle of white zinfandel.  R. 293.  Dr. Barchas also indicated that Plaintiff had not done other drugs for six years, but prior to that, cocaine was her drug of choice.  R. 293.   Plaintiff divorced before September 11,[5] and Dr. Barchas noted that there were domestic violence charges by Plaintiff's ex-husband.  R. 293.  Dr. Barchas also indicated that Plaintiff once lost thirty

---

[4] Plaintiff also sought treatment from the Sentara Norfolk General Hospital for general care, incuding an upper respiratory infection, R. 303-13, a sleep study, R. 344-47, a cervical spine x-ray, R. 348-53, cervicitis, R. 354-71, groin pain and lightheadedness, R. 372-85, foot pain, R. 386-98, a mammogram, R. 399-402, chest pain, 446-51, and additional foot pain, R. 452-57.
[5] While the record does not specify which year, this court assumes based on context that Dr. Barchas was referring to September 11, 2001.

pounds in three months because she could not eat due to a nervous breakdown.  R. 294.

Dr. Barchas noted that Plaintiff's sleep, appetite, energy, interests, socialization, mood, sex drive and self-esteem were depressed, her guilt was elevated, and her weight remained constant.  R. 294.  Dr. Barchas also indicated that Plaintiff had elevated, expansive and irritable mood changes, and during those changes she exhibited grandiosity, decreased need for sleep, increased talkativeness, flight of ideas or racing thoughts, distractability, increased goal-oriented activity or psychomotor agitation, and excessive involvement in pleasurable activities that have a high potential for painful consequences.  R. 293.  However, Dr. Barchas did indicate that there was no evidence that Plaintiff was a risk to herself or others.  R. 293.  Plaintiff's impulse control, judgment, insight and concentration/attention were marked as impaired, but the report indicated that Plaintiff was neither suicidal nor homicidal.  R. 296.  Dr. Barchas diagnosed bipolar disorder with psychotic thoughts, panic disorder, vaginosis, psychological stressors of work, family and money, and a GAF of 45.  R. 296.  She established short-term goals of establishing a therapeutic relationship, preventing or reducing self-defeating behaviors, establishing a sense of hope for change, improving and stabilizing mood, and improving control over impulses, anger, and anxiety.  R. 297.  She also established long-term treatment goals of improved and stabilized mood, interpersonal relationships, and functioning at work.  R. 297.

Plaintiff saw Dr. Barchas for treatment from June 2009 through August 2010.  R. 284-91.  Treatment notes from June indicate that Plaintiff had low self-esteem, anxiety, severe mood swings, and paranoid thoughts.  R. 291.  On June 17, 2009, Dr. Barchas started Plaintiff on a lithium trial.  R. 291.  On June 30, 2009, Dr. Barchas noted that the lithium had a calming effect on Plaintiff's moods, and noted that Plaintiff was improving and/or much improved.  R. 290.  She also noted, however, that Plaintiff suffered from anxiety.  R. 290.  On August 18, 2009, Dr.

Barchas noted that Plaintiff was suffering from anxiety, depression, delusions, hallucinations, anorexia and bulimia, and stated that Plaintiff was regressing.  R. 290.  She opined that Plaintiff was starting to feel as if people were watching her and trying to get her, and also that no one cared about her.  R. 290.  She also noted that Plaintiff complained of feeling "heavy."  R. 290. On August 26, 2009, Dr. Barchas stated that Plaintiff was much improved, and that Plaintiff's medication had reduced her psychotic thoughts and anxiety.  R. 289.  On September 22, 2009, however, Dr. Barchas indicated that Plaintiff was suffering from anxiety, depression and anger, and had regressed.  R. 289. Dr. Barchas opined that Plaintiff was wound up and had a paranoid thread to her thinking.  R. 289.  She also indicated that Plaintiff had stopped taking lithium.  R. 289.  On October 1, 2009, Dr. Barchas noted that Plaintiff had gone to the emergency room because she had a panic attack that she believed was a heart attack. R. 289.  Dr. Barchas indicated that Plaintiff had anxiety, panic, depression and mania, and started Plaintiff on lithium again.  R. 289.

On October 20, 2009, Dr. Barchas indicated that Plaintiff suffered from anxiety, depression, mania and anger, and that she appeared to be unchanging from the previous appointment.  R. 288.  Dr. Barchas described Plaintiff as having much lability of mood, and noted work issues.  R. 288.  On January 12, 2010, Dr. Barchas noted that Plaintiff was anxious and depressed, but that she was improving.  R. 287.  On January 28, 2010, Dr. Barchas indicated that Plaintiff had not had a panic attack for seventy-two hours.  R. 287.  Dr. Barchas also opined that on January 25, 2010, Plaintiff had gone to the emergency room because she believed she was having a heart attack, but she was diagnosed with having a panic attack.  R. 287.  On February 9, 2010, Plaintiff showed improvement, but Dr. Barchas still noted that she suffered from anxiety and depression.  R. 286.  On March 9, 2010, Dr. Barchas noted anxiety, depression

5

and anger, and indicated that Plaintiff was insecure, had low self-esteem, and thought that other people were thinking about her.  R. 286.  On May 12, 2010, Dr. Barchas noted that Plaintiff was more irritable, had difficulty sleeping, and had a low frustration tolerance.  R. 285.

### 3. Norfolk Community Services Board

On October 22, 2010, Anne Dibala, M.D., saw Plaintiff for an initial psychiatric evaluation.  R. 440-45.  Dr. Dibala opined that Plaintiff had formerly been seeing Dr. Barchas, but Plaintiff lost her insurance coverage when she left her job.  R. 440.  Plaintiff reported problems with paranoia, feeling like people were watching or following her, and some "mild auditory misperceptions," including hearing mumbling or her name being called.  R. 440.  She also reported seeing shadows or figures floating up and down the walls.  R. 440.  Dr. Dibala opined that Plaintiff experienced flashbacks from past abuse when triggered by watching similar things on television.  R. 440.  Dr. Dibala noted that Plaintiff reported being irritable and paranoid, but denied any suicidal or homicidal ideation.  R. 440.  She also reported that Plaintiff attended church regularly, had abstained from alcohol for three months, and had not used other substances for at least seven years.  R. 440.

Dr. Dibala opined that Plaintiff initially believed her psychiatric symptoms were a result of drug use, and only in her late twenties did the symptoms begin to develop individually. Plaintiff went to Italy in 1993,[6] and suffered severe panic.  R. 440-41.  She was put on Prozac, but suffered a mental reaction to the medication, with symptoms including agitation, paranoia, lack of sleep, and hallucinations.  R. 441.  Upon return from Italy, Plaintiff continued to have symptoms, prompting paranoia, delusions, psychosis and depression, including the belief that her food was being poisoned.  R. 441.  Sometime between 2001 and 2006, she was treated for panic disorder with agoraphobia and alcohol dependence, cocaine dependence, and borderline

---

[6] Dr. Dibala claims the trip to Italy was in 1993, though Dr. Barchas states 1996.  *See supra* page 3.

personality traits.  R. 441.  Between 2008 and 2010, Dr. Barchas diagnosed Plaintiff with bipolar disorder, and was given a lithium workup, but after several months she decided against taking lithium.  R. 441.  Additionally, Dr. Dibala noted that Plaintiff was raped at knifepoint when she was around thirty years old, and that she had some significant posttraumatic stress disorder symptoms, that over time became only occasional.  R. 441.  Plaintiff denied homicidal ideations, though expressed that she would hurt someone if she felt like she had to defend herself.  R. 441.

Plaintiff had a history of substance abuse, first trying cigarettes at age fourteen and alcohol and marijuana at age fifteen.  R. 442.  At one point, Plaintiff would have two bottles of wine or five drinks of hard liquor or beer in a day, and would smoke a couple of joints per day of marijuana.  R. 442.  She stopped smoking marijuana at twenty-five.  R. 442.  She began doing cocaine, her "drug of choice," at age twenty-one, both crack cocaine and intranasally.  R. 442. She sometimes spent hundreds or thousands of dollars in a day on cocaine, but claimed she last used in 2003.  R. 442.  She also gambled "a lot," but had not done so recently.  R. 442.  She attended Alcoholics Anonymous periodically, last in 2004.  R. 442.

Dr. Dibala's examination revealed that Plaintiff was well-nourished, in no acute distress, and was casually and neatly dressed and groomed.  R. 443.  She had fair but variable eye contact, and was distracted, but cooperative.  R. 443.  She was fidgety at times, and her mood was very irritable.  R. 443.  Her affect was mildly labile, and her speech was loud and brisk.  R. 443.  She presented with mild paranoia in her thought processes, believing that people were looking at her. R. 443.  She had no hallucinations or delusions, and no suicidal or homicidal ideations.  R. 443. Her memory and insight were fair, and her IQ was average.  R. 443.  Dr. Dibala diagnosed bipolar affective disorder type I, moderate without psychosis, panic disorder with agoraphobia,

and alcohol dependence, early full remission.[7]  R. 443.  She also indicated that Plaintiff's highest

GAF in the last year was 65.  R. 443.

On November 17, 2010, Plaintiff met with Dr. Dibala.  R. 438-39.  Plaintiff had started

on Haldol and Celexa prior to the visit, and she reported that everything had gotten better,

including being less irritable and getting better sleep.  R. 438.  She still has "racy" thoughts,

some paranoia if she is around people, and mild auditory and visual misperceptions, including

seeing shadows out of the corner of her eye.  R. 438.  Plaintiff reported spending more time with

grandchildren, going to church, and going out with her family.  R. 438.  Dr. Dibala noted that

Plaintiff had no significant depression or homicidal ideation, and that her panic attacks had

decreased markedly.  R. 438.  Dr. Dibala described Plaintiff as neatly groomed and cooperative,

with good eye contact, an okay mood, and intact abstract thinking "for proverbs."  R. 438.  Dr.

Dibala stated that Plaintiff is "alert and oriented x4, registration is 3/3, short-term 3/3, Presidents

x7, serial 7's x7."  R. 438.  Plaintiff's affect was slightly broad and a little elevated, but pleasant

and cooperative, and her speech was brisk and slightly pressured.  R. 438.  Her thought processes

were linear and goal-oriented, with no gross looseness of associations or flight of ideas and no

gross paranoia or hallucinations.  R. 438.  Dr. Dibala diagnosed bipolar disorder, type I, manic,

moderate without psychosis; panic disorder without agoraphobia, improved; alcohol dependence,

in remission; and cocaine and cannabis dependence, sustained in full remission.  R. 438.

On January 6, 2011, Plaintiff saw Earnestine Otovo, M.D.,[8] who observed similar

qualities to Dr. Dibala's observations during Plaintiff's mental status examination, except that

Plaintiff did not report any perceptual disturbances, her mood was mildly dysphoric, and her

---

[7] There is a handwritten note on the form that indicates that "borderline personality traits" and possibly "personality disorder NOS" belong in the Axis I diagnoses, but the markings are not clear.  R. 443.
[8] The treatment notes from this day were signed by another doctor whose signature is illegible, on behalf of Dr. Otovo.  R. 437.

affect was blunted.  R. 436.  On February 14, 2011, Plaintiff saw Bill Forte, M.D., and expressed to him that the medications she was taking had been "controlling her panic attacks and paranoia fairly well."  R. 433.  Dr. Forte noted that she displayed minimal anxiety.  R. 433.  He also indicated that her mood was euthymic and her affect was mood-congruent.  R. 434.

From March 15, 2011 to September 7, 2011, Plaintiff saw Sari Kohazi, M.D., six times. R. 415-32.  At each visit, Dr. Kohazi described Plaintiff as alert and oriented, with a level and euthymic mood and appropriate affect.  R. 415-32.  Dr. Kohazi also repeatedly noted that Plaintiff had no symptoms of psychosis, delusions or paranoia.  R. 415-32.  At almost all of the visits, Dr. Kohazi diagnosed schizoaffective disorder, bipolar type, currently in remission; bipolar disorder, not otherwise specified; cannabis dependence, currently in remission; and alcohol abuse, currently in remission, with a GAF of 65.  R. 415-32.  In later appointments, Dr. Kohazi's diagnoses stated "rule out bipolar disorder, NOS," R. 418, and removed the modifier "bipolar type" from the diagnosis of schizoaffective disorder, R. 415.

C.  Opinions Regarding Plaintiff's Condition

*1. Plaintiff's and her Daughter's Statements Regarding her Condition*

On August 22, 2010, Plaintiff filled out a Function Report.  R. 232-39.  In it, she stated that on a typical day, she showered, ate, watched television, maybe sat outside on her steps, and went to bed.  R. 232.  She indicated she had trouble sleeping because her mind raced, and that she would be more social and go out more if it weren't for her condition.  R. 233.  She noted that she prepared food daily, but that sometimes she did not eat, and that her only household chore was cleaning the laundry, which she did when she felt like it.  R. 234. She explained that she did not do yard work because she did not go outside much.  R. 235. She went outside two times a week, approximately, and indicated that she could not go out alone because sometimes she got

very paranoid.  R. 235.  She indicated that she did go shopping for food and clothes once a month, and that she could pay bills, count change, handle a savings account and use a checkbook.  R. 235.  Her hobbies included watching television and occasionally reading books, and she spent time with family talking or watching television twice a week.  R. 236.  She also went to church.  R. 236.  She noted that sometimes she had problems getting along with family and friends, because sometimes she could not be around people due to her illness and occasional panic attacks.  R. 237.  She indicated that her conditions affected her ability to talk, her memory, and her ability to get along with others.  R. 237.  She noted that she could only pay attention for approximately ten minutes, she did not finish what she starts, she did not follow written instructions well, and she was fair at following spoken instructions.  R. 237.  She stated that she got along "ok" with authority figures, she handled changes in routine "ok sometimes," she handled stress poorly, and if she was around too many people she got panic attacks.  R. 238. Finally, she wrote that her panic attacks and fear of others gave her paranoid feelings, and that her disorder changed her life, though she did her best.  R. 239.

Plaintiff's daughter also filled out a function report, on August 23, 2010.  R. 240-50.  In it, she indicated that Plaintiff in a typical day watched television, slept and argued.  R. 241.  She stated that Plaintiff prepared meals daily, frozen dinners and sometimes complete meals, and that she would perform some light housework, including laundry, approximately twice a week.  R. 243-44.  Plaintiff's daughter also opined that Plaintiff did not go outside often, and that when she did was largely dependent on circumstance.  R. 244.  She indicated that Plaintiff shopped for clothes, food and household items "not too often," and that she could pay bills, count change, handle a savings account, and use a checkbook.  R. 245.  She also noted that Plaintiff watched television "all the time," and that she could not be around people.  R. 245.  She indicated that

Plaintiff sometimes, but not often, spent time with others, including church and sometimes the grocery store.  R. 246.  She also stated that Plaintiff's mood changed "in a split second," and that she had been less sociable since her illness began.  R. 246.  She indicated that Plaintiff had trouble getting along with others, and that she "can't talk to people."  R. 246-47.  She also noted that Plaintiff did not finish what she started, did not easily pay attention, did not follow written or spoken instructions well, and did not get along with authority figures well.  R. 247.  She indicated that Plaintiff did not handle stress well at all, or changes in her routine, and that since her condition started Plaintiff did not want to go out because she believed that people were after her or talking about her.  R. 248.

*2. Dr. Kohari's Opinion*

On February 27, 2012, Dr. Kohari completed a medical evaluation report.  R. 459-61.  In it, Dr. Kohari opined that Plaintiff was diagnosed with schizoaffective disorder, symptoms of which "contribute to poor occupational functioning, limited social contact and difficulties with self care."  R. 459.  She indicated that Plaintiff was not significantly limited in her ability to carry out very short and simple instructions and to ask simple questions or request assistance; moderately limited in her ability to remember locations and work-like procedures, understand and remember short and simple instructions, maintain attention and concentration for extended periods, make simple work-related decisions, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and to travel in unfamiliar places or use public transportation; and markedly limited in her ability to understand and remember detailed instructions, carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them,

11

complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions or respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to customary stresses in a work setting, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. R. 459-61. Plaintiff's clinician, Ami Phillips, L.P.C., C.S.A.C., added a note stating that Plaintiff's mental stability would be compromised in a work environment "due to her suspicions and paranoia when around others." R. 461.

### 3. Opinions of DDS Physicians

Both initially and on reconsideration, non-treating physicians Alan D. Entin, PhD, ABPP, Sreeja Kadakkal, M.D., and Robert Castle, M.D. determined that, based on the medical records with which they were presented, Plaintiff did not suffer a severe impairment from either her anxiety or her arthritis. R. 98-125. As such, they did not analyze Plaintiff's residual functional capacity. *Id.*

### D. Administrative Hearing Testimony

At Plaintiff's administrative hearing, she testified that she went to school through the tenth grade, was able to read, write and do simple mathematics, and had a driver's license but did not drive often. R. 49-50. She also stated that she worked for the Navy Exchange off and on between 1995 and 2010, and she worked there continuously from 2006 to 2010.[9] R. 51. Plaintiff left the Navy Exchange in 2010 because she became paranoid and anxious during her shifts. R. 52-53. She also acknowledged previous work at 7-Eleven and Virginia Beach Estates,

---

[9] Plaintiff's attorney stated that Plaintiff was not contesting the work she did from 2006-2010 was substantial gainful employment. R. 51. Though the ALJ and Plaintiff's attorney discussed amending Plaintiff's alleged onset date, the date was not officially amended on the record. R. 51-52.

where she worked as a clerk and a personal care aide, respectively. R. 53-54. While describing her typical day, Plaintiff stated that she might sit outside, but that sometimes she could not, and cited a whole year in which she could not go outside because of her anxiety. R. 54-55. She noted that she went to church, did her own cooking and cleaning, and sometimes went shopping with others, but she did not go out socially much anymore and did not have any hobbies. R. 55-57.

When asked to explain why she could not work, Plaintiff stated that being around people was difficult, and that she sometimes felt like reality was not real, and it frightened her. R. 57-58. At this point, Plaintiff stopped being able to answer questions, and the hearing briefly went off-the-record. R. 58. When the record resumed, Plaintiff discussed her treatment at the Norfolk Community Services Board, stating that treatment and medication helped her feel better, and that she would probably be on the streets without it. R. 59. She also talked more in-depth about the year her anxiety prevented her from leaving the house, stating that she also lost thirty pounds during that time. R. 60. She stated that at the time of the hearing, she went outside mostly to sit on the porch, or for appointments, and that she went whole weeks without leaving the house. R. 61. When she did have to leave, she often felt overwhelmed and anxious, like something bad would happen. R. 61-62. Additionally, she noted that being around people made her anxious and paranoid, and sometimes when she felt that way in public she had to immediately leave. R. 62-63. She also discussed the arthritis in her knee, stating that sometimes the knee swelled so badly she had difficulty walking on it, and that those flare-ups would last sometimes up to seven or eight days. R. 63-64.

When examined by her attorney, Plaintiff stated that the moment off-the-record earlier in the hearing was because she had a small panic attack, because she became paranoid by the presence of the vocational expert ("VE"). R. 65. She stated that she did not know why the

woman was sitting there quietly and not saying anything, even though prior to the hearing, Plaintiff's attorney explained who she was and what her role was in the proceedings.  R. 65. Plaintiff also stated that in that moment, because she grew nervous due to the presence of the VE, voices in her head told her to leave.  R. 65.  Plaintiff also indicated that Dr. Barchas suggested that Plaintiff leave her job because of her condition.  R. 66.

A VE also testified at the hearing.  The ALJ posed a hypothetical regarding a person of Plaintiff's same age, education and work experience, who was capable of medium exertion but would be limited to simple, repetitive tasks and a work environment that would not involve close interaction with the general public and only occasional close interaction with coworkers.  R. 68. The VE testified that jobs existed in the national economy that met these criteria, specifically janitor/industrial cleaner, kitchen helper, cleaner/housekeeper, and laundry worker.  R. 68.  The ALJ posed a second hypothetical, with the same limitations as in the first, and adding limitations in that person's ability to carry out detailed instructions, perform activities within a schedule or maintain regular attention, sustain an ordinary routine without special supervision, work in coordination or proximity to others without being distracted, complete a normal workday or work week without interruptions, interact generally appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them, respond to customary work stresses, be aware of normal hazards and take appropriate precautions, and set realistic goals or make plans independently of others. R. 69.  The VE testified that there would be no work for such an individual.  R. 69.

### III.  STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the

record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as 'a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined

in the Social Security Act. The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

     A.    <u>ALJ's Decision</u>

In his April 3, 2012 decision, the ALJ found that Plaintiff met the insured status requirement through June 30, 2014. R. 32. At step one of the five-step analysis, he concluded that Plaintiff had engaged in substantial gainful activity from January 10, 2007, the alleged onset

date, to June 15, 2010, but that she had not engaged in substantial gainful activity since June 16, 2010. R. 32-33. At step two, the ALJ found that Plaintiff had the severe impairments of bipolar disorder, osteoarthritis of the knees, and obesity. R. 33. At the third step, the ALJ concluded Plaintiff did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." R. 33-35.

After looking at the record, the ALJ found Plaintiff had the residual functional capacity (RFC) to perform medium work, limited by restrictions that she can only perform simple, repetitive tasks that require no close interaction with the public and only occasional interaction with co-workers. R. 35. At the fourth step, the ALJ found Plaintiff was not capable of performing any of her past relevant work. R. 38. At step five, he found that with her age, education, and residual functional capacity, there were jobs that existed in the national economy that Plaintiff could perform. R. 38. The ALJ found that Plaintiff was capable of performing jobs such as janitor or kitchen helper, both of medium exertion, or the light exertion jobs of cleaner/housekeeper and laundry worker. R. 39. Based on these findings, the ALJ concluded that Plaintiff had not been under a disability as defined by the Social Security Act. R. 39.

Plaintiff argues the ALJ (1) substituted his own opinion for that of physicians' in the record, and (2) failed to properly rely on the VE's testimony. Pl.'s Mem. in Supp. 12-17, ECF No. 8. The Court cannot find substantial evidence in the record to support the ALJ's decision due to the ALJ's failure to appropriately address the medical opinions in the record, and his subsequent substitution of his opinion for that of the physicians' in the record.

B. The Court Cannot Find Substantial Evidence to Support the ALJ's Decision Where the ALJ Failed to Properly Consider the Opinion Evidence When Determining Plaintiff's Residual Functional Capacity and Substituted his Opinion for that of the Physicians' in the Record

Plaintiff argues that the ALJ improperly discounted both the DDS medical consultant

opinions and the opinion of Dr. Kohazi, the only treating source physician's opinion in the record; she also argues that by doing so, the ALJ improperly substituted his own opinions on Plaintiff's capacity to work for those of trained medical professionals.  Pl.'s Mem. in Supp. 12-14.  In his decision, the ALJ stated that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ."  R. 37.  He discounted the DDS medical consultants because they found Plaintiff had no severe impairments, but the ALJ found the presence of severe impairments based on "more recent evidence."  R. 37.  The ALJ also gave the opinions of Dr. Kohazi "little weight" because they were "out of proportion to the findings in multiple treatment records, which document significant improvement in the claimant's mental symptoms with treatment and the use of medications . . . ."  R. 38.

The question here is not, as Defendant has framed it, a question of whether the ALJ properly discounted the opinion of Dr. Kohazi.  Def.'s Mem. in Supp. 8-10, ECF No. 10.  Rather, the question is whether, by discounting Dr. Kohazi's opinion and the opinions of the DDS physicians, the ALJ improperly substituted his opinion regarding Plaintiff's impairments for that of the trained medical professionals who examined Plaintiff and her records.  This Court finds that the ALJ did improperly substitute his opinion for those of the physicians in the record.  "In the absence of any psychiatric or psychological evidence to support his position, the ALJ simply does not possess the competency to substitute his own views on the severity of plaintiff's psychiatric problems for that of a trained professional."  *Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985), citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974), *McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983).  By discounting all medical opinions in the

record, the ALJ necessarily substituted his opinion for those of the medical professionals directly involved with Plaintiff's treatment and analysis. *See Hamilton v. Astrue*, No. 2:10cv9, 2010 WL 4669014, \*4-\*5 (W.D. Va. Nov. 10, 2010) (finding that the ALJ's discounting of all three physicians' medical opinions, two because they "lacked medical support" and one because the physician found no severe impairment but the ALJ found severe impairment, was an improper substitution of the ALJ's opinion for the medical experts' opinions and should be remanded for additional medical opinions); *see also Smith v. Astrue*, 1:09cv19, 2009 WL 4348825, \*16-17 (W.D. Va. Nov. 24, 2009) (holding that, in a record where there were treating physician opinions and treatment records "which contained complaints and diagnoses of depression, anxiety and insomnia," the ALJ's discounting of "the only psychiatric or psychological opinions of record," was in error, and the ALJ wrongfully substituted her own opinion for that of a trained medical professional), *Wilson v. Astrue*, No. 2:08cv14, 2008 WL 5186532, \*6-7 (W.D. Va. Dec. 10, 2008) (finding that an ALJ's decision to discount the treating physician's opinion regarding mental state and instead giving greater weight to the DDS physicians' opinions finding that no severe impairment exists overall, qualifies as substituting the ALJ's opinion for that of a trained medical professional, and is grounds for remand); *but see Salyers v. Comm'r of Social Security*, No. 2:12cv14, 2013 WL 4929141, \*13 (W.D. Va. Sept. 12, 2013) (holding that "[w]hile it is true" that there was only one mental health professional's opinion in the record, "it does not follow that the ALJ was bound to accept it in its entirety").

This case is factually similar to *Smith* and *Wilson* cited above. *Smith* specifically states that there were medical records regarding the plaintiff's treatment for depression, anxiety and insomnia. *Smith*, 2009 WL 4348825 at \*16. However, the district judge in that case still found that by discounting the treating physicians' opinions, the ALJ "essentially ignored the findings"

of the treating physicians, both of whom were trained medical professionals. *Id*. at *17. This constituted reversible error, even though the ALJ had access to the plaintiff's treatment notes. *Id*. In *Wilson*, the ALJ gave greater weight to the opinions of the DDS physicians, who found that the plaintiff in that case had no severe impairment. *Wilson*, 2008 WL 5186532 at *7. Ordinarily, this would not cause a decision to be remanded; however, in that case, as in this one, the DDS physicians had not received all of the treatment evidence at the time of their determination. *Id*. Because of that, the magistrate judge recommended remanding the case. *Id*. In this case, the ALJ discounted the DDS physicians' opinions for the same reason the magistrate judge in *Wilson* found they had no weight; the DDS physicians had not seen "more recent evidence" that would "confirm[] the presence of a 'severe' knee impairment and 'severe' mental disorder." R. 37-38. The ALJ discounted all opinion evidence in this case, and then, in the absence of other medical opinion evidence, substituted his opinion on Plaintiff's ability to work for those of the trained medical professionals in the record.

In general, "when there is an inconsistency in the evidence or 'when the evidence as a whole is insufficient to allow [the Commissioner] to make a determination or decision' on a claim," "a consultative examination is warranted." *Hoy v. Colvin*, No. 5:12cv70, 2010 WL 4010647, *4 (W.D. Va. Aug. 5, 2013), *citing* 20 C.F.R. §§ 404.1519a, 416.919a. *Hamilton*, *Smith*, and *Hoy* all indicated that the ALJs in those cases should have ordered a consultative examination, rather than substituting their own opinions. *See Hoy*, 2010 WL 4010647 at *4, *Hamilton*, 2010 WL 4669014 at *4-*5, *Smith*, 2009 WL 4348825 at *16-*17. In this case, the best practice on the part of the ALJ should have been ordering a consultative examination. Regardless, by discounting all medical opinion evidence in the record and offering no additional opinion evidence, the ALJ created an environment where he necessarily had to substitute his

20

opinion for that of a trained medical professional, which is improper.  Because of this, this Court recommends the Commissioner's decision be VACATED and the case be REMANDED. Because the Court has recommended remand based on Plaintiff's first assignment of error, the Court notes that Plaintiff's remaining claims will not be addressed.

## V.  RECOMMENDATION

For the foregoing reasons, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be GRANTED; the Commissioner's Cross Motion for Summary Judgment (ECF No. 9) be DENIED; and the final decision of the Commissioner be VACATED and REMANDED for further analysis consistent with this Report and Recommendation.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


_____/s/_____
Tommy E. Miller
United States Magistrate Judge

Norfolk, Virginia
May 29, 2014